JUDGE CEDARBAUM

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| DANIELLE BOBIN, Individually and on behalf of Herself and All Others Similarly Situated, | ) ) ) | Civil Action No. 08 CIV 5383 |
| Plaintiff, | ) ) ) | CLASS ACTION |
| vs. | ) ) ) | COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS |
| LAGARDÈRE SA, DAIMLER AG, RALPH D. CROSBY, JR., and JOHN LEAHY, | ) ) ) | JURY TRIAL DEMANDED |
| Defendants. | ) ) | |

DECEIVED
JUN 12 2008
U.S.D.C. S.D.N.Y.
CASHIERS

## INTRODUCTION

1.     This is a federal securities class action brought on behalf of all purchasers of the publicly traded securities of European Aeronautic Defense and Space Company EADS N.V. (*EADS* or the *Company*) during the period from May 9, 2005 through and including March 11, 2008 (*Class Period*), to recover damages caused by defendants' violations of the federal securities laws.

2.     Over the last ten years, EADS has become one of the largest aeronautic and defense manufacturers in the world. Under EADS's shareholding structure, its core controlling shareholders are defendants Lagardère SA (*Lagardère*) and Daimler AG (*Daimler*).

3.     Throughout the Class Period, defendants claimed that, as a result of the new double-deck, four-engined A380, Airbus had become the world's "Number One" aircraft manufacturer. Defendants credited the production of the new A380 for its positive financial performance, and repeatedly assured investors throughout the Class Period that the A380 production was "as scheduled and on target." Indeed, for years, defendants promised that EADS, through the new A380, would overtake its main competitor Boeing, which had continued to hold a monopoly in the "very large carriers" sector through its 747 aircraft.

4.    As set forth below, defendants knowingly and affirmatively misrepresented contemporaneous material facts concerning EADS's true financial condition and its ability to meet delivery targets for the Airbus A380. While defendants continued to report that its A380 program was "*progressing as planned*" and "*certification was on target*," defendants knew (but failed to disclose) that the significant production delays in connection with the A380 would negatively impact the Company's financial condition.

5.    Defendants knew that if they revealed the impact the A380 delays would have on the Company's financial results, EADS would risk losing the race to be the "world's 'Number One' aircraft manufacturer," potentially lose significant contracts with the US Department of Defense and Homeland Security, and seriously deflate the Company's stock price.

6.    Rather than disclose the impact the A380 delays would have on the Company's financial results, defendants traded on this inside information, selling significant interests amounting to 122,580,000 shares for a total profit of €3,988.9 million (or $6,242.4 million) during the Class Period.

7.    The truth concerning defendants' fraud was fully revealed by the end of the Class Period, when defendants issued a press release announcing a loss of €446 million, or $696 million for 2007, attributable to Airbus's production delays with the roll-out of the A380.

8.    A number of investigations have been initiated against senior officers and executives of EADS, as well as its core shareholders (i.e., defendants Lagardère and Daimler). The Paris public prosecutor's office and the French securities regulator (*AMF*) are both investigating defendants for being privy to inside information when they sold EADS shares in the months before the Company revealed serious production delays on the A380. The conduct

being investigated by Paris prosecutors and the AMF is substantially similar to the fraudulent conduct alleged herein. As stated in an October 31, 2007 news article:

> French and German judicial authorities are investigating possible insider trading of EADS shares in late 2005 and early 2006 before it emerged that Airbus would have to delay deliveries of its flagship A380 superjumbo jet.
>
> France's *Le Monde* newspaper reported Saturday that the French stock market regulator AMF decided to widen the probe into alleged insider dealing at EADS to examine whether the European consortium had deliberately put out "misleading information" to the stock market.

In fact, according to a recent news article, the AMF has now concluded that 17 EADS executives should face insider-trading charges and that the company had issued misleading information to the markets.

9.     As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, plaintiff and other members of the Class have suffered significant damages.

## JURISDICTION AND VENUE

10.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (*Exchange Act*), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder 17 C.F.R. § 240.10b-5.

11.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. §§ 1331 and 1337.

12.     Pursuant to the "effect test" of extraterritorial jurisdiction, this Court may properly exercise subject matter jurisdiction over the claims of (a) all investors who purchased or acquired EADS securities traded on US markets, and (b) American investors who purchased or acquired EADS securities regardless of where those securities traded.

13.     This Court may also properly exercise subject matter jurisdiction over the claims of foreign class members who acquired EADS ordinary shares traded on foreign markets under the "conduct test" articulated by the Second Circuit, which provides that a federal court has subject matter jurisdiction if (a) the defendant's activities in the US were more than "merely preparatory" to a securities fraud conducted elsewhere, and (b) these activities or culpable failures to act within the US "directly caused" the claimed losses.

14.     Defendants engaged in extensive fraud-related conduct in the US, which was part of a single fraudulent scheme spanning the world.  The domestic conduct was not merely "preparatory" or perfunctory acts, but led directly to losses by both foreign and domestic investors.  In addition to the substantial US conduct in furtherance of the fraud, defendants have a US presence that justifies the exercise of subject matter jurisdiction over the claims of all plaintiffs who acquired EADS securities traded on foreign markets, and were defrauded by defendants' misrepresentations.

15.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391.  Defendant Lagardère is headquartered in Paris, France, but conducts business and maintains its North American headquarters in this District.   Defendant Daimler is headquartered in Stuttgart, Germany, but conducts business and maintains offices in this District. In addition, many of the acts and practices alleged in this Complaint, including the preparation and dissemination of false and misleading statements, occurred in this District.

16.     In connection with the acts, transactions and conduct alleged in this Complaint, defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications and the facilities of the national securities markets.

PARTIES

17.    Plaintiff Danielle Bobin purchased EADS ordinary shares during the Class Period, as set forth in the attached certification, and was damaged thereby.

18.    Defendant Lagardère is a French conglomerate with holdings in publishing, retail, media and aerospace. Lagardère co-owned and co-controlled EADS throughout the Class Period. At the beginning of the Class Period, it held a 30% stake (along with the French State through the *Sogeade* holding company). On April 4, 2006, it announced that it would sell 7.5% of its interest (or 61 million shares) to a group of international banks.

19.    Defendant Daimler is a German corporation that engages in the development, manufacture, distribution, and sale of automotive products, including passenger cars, trucks, vans, and buses worldwide. Daimler operates in four segments: (1) Mercedes-Benz Cars, (2) Daimler Trucks, (3) Daimler Financial Services, and (4) Vans and Buses. Daimler co-owned and co-controlled EADS throughout the Class Period. At the beginning of the Class Period, Daimler held a 30% stake in EADS. On April 4, 2006, Daimler announced that it would sell 7.5% of its interest (or 61 million shares) to a group of international banks.

20.    Pursuant to a *Participation Agreement*, defendants Lagardère and Daimler jointly controlled EADS throughout the Class Period. With respect to the Board of Directors, the annual reports state that the Participation Agreement allows Daimler and Sogeade to each nominate four of the ten members of the Board of Directors, and each party is allowed to nominate an additional independent Director. Therefore, the seats on the Board are equally split between Daimler and Sogeade nominees. Furthermore, pursuant to the Articles of Association of the Company, the Board of Directors is responsible for the management and the affairs of the company. Each director has one vote, and all decisions of the Board require a vote in favor by at least seven Directors. In the event of a deadlock, the matter shall be referred to Arnaud

5

Lagardère (or such person as shall be nominated by Lagardère) as representative of Sogeade and to the CEO of Daimler.

21.    The annual reports also state that the Board of Directors appoints two CEOs, who are responsible for the day-to-day management of the Company -- one chosen from the Daimler-nominated Directors and one chosen from the Sogeade-nominated Directors. Furthermore, the Company has granted general powers to each of the CEOs, authorizing them to each individually represent the Company. In the event of a deadlock between the two CEOs, the matter is referred to the two Chairmen (who are also appointed by the Board of Directors -- one chosen from the Daimler-nominated Directors and one chosen from the Sogeade-nominated Directors).

22.    Defendants Lagardère and Daimler maintained joint-control over EADS throughout the Class Period. In fact, according to the EADS April 4, 2006 press release announcing that each of these two defendants was selling a 7.5% interest in EADS, "Daimler[] and Lagardère have also noted that, under the shareholder agreements, the balance of control between the core shareholders in EADS's corporate governance remains unchanged."

23.    Defendants Lagardère and Daimler, by virtue of their positions of control and authority as joint-controlling shareholders of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to EADS during the Class Period. Defendants Lagardère and Daimler are liable, jointly and severally, as direct participants in and co-conspirators of, the wrongs complained herein.

24.    Defendant Ralph D. Crosby, Jr. has been Chairman and Chief Executive Officer of EADS North America since 2002. Throughout the Class Period, Crosby was EADS's Senior Executive in the United States and Chief Executive of the Company operating all US subsidiaries of the group, and continues to hold this role today.

25.     Defendant John Leahy joined Airbus North America in January 1985, becoming head of sales soon after. Leahy was appointed President of Airbus North America in 1988 and was responsible for penetrating the strategic North American market, where most major US airlines are now Airbus customers. Leahy was also instrumental in the launch of the A380-800 passenger aircraft and the A380-800F freighter aircraft. During the Class Period, he was also a member of the Airbus Executive Committee (or Management Committee), Chief Operating Officer-Customers, and Chief Commercial Officer of Airbus, a role he held since August 1994. Throughout the Class Period, his responsibilities covered all commercial activities including sales, marketing, contracts, business transaction control, asset management, leasing, and business development.

26.     Defendants, by virtue of their positions of control and authority, were able to and did control the content of the various SEC filings, press releases and other public statements concerning EADS during the Class Period. Defendants are liable, jointly and severally, as direct participants in and co-conspirators of, the wrongs complained herein.

27.     Each of the defendants are liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on all purchasers of EADS securities during the Class Period, by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived plaintiff and the investing public regarding the intrinsic value of the Company's securities; and (ii) caused plaintiff and other members of the Class to purchase EADS securities at artificially inflated prices.

## DEFENDANTS' FRAUDULENT SCHEME AND COURSE OF BUSINESS

### Background

28.     EADS is a European aerospace corporation, formed by the merger on July 10, 2000 of DaimlerChrysler Aerospace AG (*DASA*) of Germany, Aérospatiale-Matra of France, and

Construcciones Aeronáuticas SA (*CASA*) of Spain. The Company develops and markets civil and military aircraft, as well as missiles, space rockets, satellites and related systems.

29.    Airbus, a subsidiary of EADS, develops, produces and supports airliners seating from 100 to 525 passengers. Airbus is managed by an Executive Committee headed by a President and Chief Executive Officer appointed by the EADS Board of Directors.

30.    Airbus's A380 was touted as being the largest passenger airline ever built, and has been the centerpiece of EADS's efforts to compete with US rival Boeing.  According to Airbus's website, this double-decker four-engined jetliner carries "525 passengers aboard the most advanced, spacious and efficient aircraft ever conceived" and "offers more space to passengers of first, business, as well as economy class, along with wider seats and aisles."

31.    Defendants announced EADS's first orders for the Airbus A380 on April 30, 2000.  Thereafter, EADS periodically announced additional orders for the A380 over the next few years.

32.    For example, FedEx placed an order for ten A380 freighter aircrafts in January 2001 (which was later cancelled in November 2006 given "ongoing uncertainties over the delivery schedule").  EADS's January 17, 2001 press release, titled "FedEx Express to acquire Airbus A380-800F", states:

> FedEx Express, a subsidiary of FedEx Corp. will acquire the A380-800F, becoming the launch customer for the freighter version of Airbus' all-new, very high-capacity, long-range aircraft. FedEx Express will take delivery of ten of the aircraft beginning in 2008 when forecasts for growth in key international air cargo markets indicate demand will exceed the capacity of the MD-11, the company's current long-range intercontinental aircraft.
>
> As the launch customer for the A380-800F FedEx Express will take delivery of three aircraft each in 2008, 2009 and 2010, as well as one in 2011.
>
> "The FedEx order is a major milestone in the A380 programme. FedEx is our first U.S. customer for the aircraft and the initial customer for the freighter version," said Noël Forgeard, Airbus Chief Executive Officer. "This clearly reflects the

versatility of our all-new very large aircraft which was carefully conceived from the outset to be both a highly efficient passenger airliner and a freighter."

The decision to acquire the A380-800F also follows a two-year study at FedEx Express of the company's long-term needs for very large, long-range aircraft. Experts in aviation and international trade forecast seven percent average annual growth in the international air cargo market over the next 20 years. FedEx Express reviewed proposals from both Airbus and Boeing for such an aircraft before selecting the A380-800F.

33.    EADS stated in an April 4, 2001 press release that "Virgin Atlantic had firmed up its commitment for six A380s plus options by signing a firm contract for the 21st century jetliner today. The A380, the only all-new very large aircraft on offer, has demonstrated its success in the marketplace by winning 62 firm commitments plus options from eight customers." Noël Forgeard, then Chief Executive Officer of Airbus, was quoted as stating "Virgin Atlantic is one of the most innovative airlines and we know that Virgin will take full advantage of the great potential we are offering with the A380."

34.    On November 2001, the Company announced Emirates Airlines had signed a contract for 22 A380 superjumbos (firm orders) and ten options.

35.    In June 2003, Korean Air signed a Memorandum of Understanding with Airbus to acquire up to eight A380-800 passenger aircraft (five firm orders and three options). Deliveries to Korean Air were scheduled to begin in late 2007 through 2009. Qatar Airways signed a firm contract with Airbus for two A380s in December 2003, scheduled for delivery in early 2009.

36.    In January 2004, EADS began claiming that, as a result of the A380, Airbus had become the world's "Number One" aircraft manufacturer. For example, in a January 15, 2004 press release, EADS claimed a "54 percent market share in the category of aircraft above 100 seats. . . . The success is especially significant in the wide-body field. The orders placed by four customers, including two new ones, for Airbus' A380 double-decker, which is due to first fly in early 2005, are significant and confirm the market's interest in the all new airliner." Airbus

9

credited "the production of the new A380," which it claimed was "as scheduled and on target," for this performance.

Defendants' False and Misleading Statements During the Class Period

37.     The Class Period begins on May 9, 2005, when defendants issued a press release announcing the Company's first quarter 2005 results (filed with the SEC on May 18, 2005), stating "Airbus has maintained its leadership in deliveries and orders and has realized a steady improvement in its profits. *The successful A380 first flight demonstrates the potential for further strong revenues and EBIT growth at Airbus in the years to come.*" (Emphasis added.) The May 9, 2005 press release further stated:

> The successful first flight of the A380, the flagship of the Airbus fleet, on 27 April marked a take-off into a new era of commercial aviation. In total, Airbus received 154 firm orders and commitments from 15 customers for the A380 until the end of April 2005
>
> *       *       *
>
> Three Chinese airlines have signed contracts for the purchase of 30 Airbus aircraft, among them five A380. These orders underline Airbus's strong footprint in the Chinese market.

38.     Defendants subsequently filed the Company's 2004 Annual Report with the SEC on May 23, 2005,[1] which stated that, with respect to the A380 delivery schedule:

> [f]our A380s, destined for use as test aircraft, are now assembled and production of major components for additional aircraft at Airbus' [sic] sites around Europe is *progressing as planned*. The first A380 to fly has completed many of the required ground and systems tests and will soon be handed over to the Airbus Flight Test Department for in-flight testing. Three more aircraft have passed through the final assembly station at the purpose-built facility in Toulouse.

(Emphasis added).

39.     The Annual Report filed with the SEC also stated that "at year-end 2004, Airbus had received a total of 139 firm orders for the A380 from leading world airlines," including

---

[1] The 2004 Annual Report was also filed with French regulators on April 19, 2005.

FedEx. According to the Annual Report, China Southern airlines entered into an agreement to purchase five A380s from Airbus on January 28, 2005, representing the "first commitment from a Chinese carrier for the A380 aircraft, making a significant breakthrough for EADS in this important and strategic market." In January 2005, "UPS became the third US based customer for the A380, with its agreement to purchase ten freighter versions of the new aircraft, plus an option for ten additional aircraft."

40.     EADS's 2004 Annual Report contained defendants' representation that the Airbus A380 -- the largest passenger airline -- provided a competitive edge over Boeing in the Company's ability to win lucrative government defense contracts, stating "EADS seeks to provide a competitive alterative to the near-monopoly enjoyed so far by Boeing products in the market for strategic tanker aircraft."

41.     On June 1, 2005, defendants announced the first A380 delay, with delivery slipping by six months, and reducing the number of planned deliveries by the end of 2009 from about 120 to about 100. However, defendants assured investors by stating, among other things, that "the plane is continuing to perform well in tests."

42.     On July 27, 2005, defendants issued a press release announcing half year results, which "indicate strong performance for full year 2005." In further reassurance to the market that the previous month's delay was only minor, the press release stated that "up to date, Airbus has received 159 firm orders and commitments from 16 customers for the A380. The aircraft has entered its test flight phase and is *yielding good results*." (Emphasis added).

43.     On October 18, 2005, defendants announced the successful flight of the second test A380. Specifically, Charles Champion, Chief Operating Officer and head of the A380 program, stated: "[t]he tests are going better than we expected and we can already say with

certitude that we will deliver a great aircraft . . . . I am certain that the second test aircraft will continue to show that the A380 combines technological innovation with extraordinary quality and reliability." Defendants also announced that the first A380 "is *yielding very good results, and is in fact ahead of the test programme schedule.* . . . Upon completion of the certification process the world's largest commercial airliner will be delivered to the first operator Singapore Airlines in late 2006. The A380 is already a proven success story, with 159 orders from 16 customers." (Emphasis added.)

44.     On November 4, 2005, defendants issued a press release touting the successful first flight of the third A380. The announcement stated that "*test flights are progressing well towards type certification in the last quarter of 2006*, in time for first delivery to initial operator Singapore Airlines." (Emphasis added).

45.     On November 9, 2005, defendants announced "strong 9-month performance and raises earnings guidance for 2005" stating that the "strong EADS performance is due to the further increase in Airbus deliveries, high revenues and earnings in its defence businesses as well as continued profitability improvement in its Space Division." The press release also stated:

> [S]elf-financed R&D charge has decreased to €1.4 billion in the first nine months of 2005 (9/2004: €1.6 billion). This is in large part due to the A380 passenger version moving from development to production and the increase of R&D capitalization for the A380 in relation to the certification process. R&D expenses are expected to increase again in the following quarters when the development phase of the A380 freighter and A350 programme ramps up.
>
> *     *     *
>
> [F]or the A380, Airbus has received 159 firm orders and commitments from 16 customers to date. In 2005 three new customers have so far committed to the A380 and Airbus has already successfully completed more than 120 test flights with its three flying A380s. The world's largest passenger aircraft *recently successfully demonstrated its airport readiness* at Frankfurt airport and will shortly undertake similar exercises at different Asia-Pacific hubs."

(Emphasis added). The release also stated that "with its three already flying A380s, Airbus successfully completed more than 120 test flights, adding up to 450 flight hours. The test phase began with the A380 first flight in April. The second A380 joined the flight test campaign in October, the third one in November."

46.    As reported in a November 11, 2005 International Herald Tribune article, during the first landing of the test A380 in Asia, defendants further vowed that that "*there would be no further delays in the delivery* of the superjumbo and promised compensation for losses." The article further noted that "Airbus, which has 159 firm orders for the A380 so far, also said it was negotiating to sell the jet to more carriers in China and India and was *confident of maintaining its lead against its U.S. archrival, Boeing*." (Emphasis added.)

47.    On December 13, 2005, Atlanta, Georgia-based UPS formally signed a contract (previously committed to in January 2005) for ten A380 freighter aircrafts. According to defendants' press release issued that day, deliveries to UPS were scheduled between 2009 and 2012. The December 13 contract also made UPS the third US based customer for the A380. In particular, defendants reaffirmed in the press release that "the first A380 freighter is slated for delivery in 2008."

48.    Continuing to mask that EADS was going through a "zone of turbulence," on January 17, 2006, defendants issued a press release titled "2005: Airbus continues to lead" which noted that the:

> [f]irst flight test of the all new double decker [A380] continues to progress well, with the three aircraft now flying having achieved 800 flight hours and 220 flights. *Certification is planned in time for the delivery to the first operator*, Singapore Airlines, *which is planned for the end of the year.*"

(Emphasis added.)

49.    On March 8, 2006, EADS presented its 2005 annual results. In the press release titled "Outstanding 2005 results - higher profitability expected in 2006," defendants announced a strong EBIT improvement, noting that "in 2005, EADS clearly outperformed its previous record year. The outstanding result is mainly due to the continued strong revenues and earnings of Airbus as well as the Group's space and defence business." Defendants also announced that "[f]ree Cash Flow (FCF) before Customer Financing was again strongly positive, reaching €2.2 billion (2004: €1.8 billion). This performance reflects the positive cash contribution from operations, driven by contributions from working capital, higher net income and lower capital expenditures on the A380 development."

50.    With respect to the deliveries of the A380, defendants also announced on March 8, 2006 that:

> Orders for 20 A380s and seven A300 freighters completed Airbus's order intake. At the end of 2005, the Airbus order book amounted to € 202.0 billion based on the list prices. This is an increase of 48 percent over year-end 2004. The order book represents a total of 2,177 commercial aircraft (2004: 1,500). *The A380 is on track for certification, with the first delivery scheduled for the end of 2006.* Airbus has already successfully completed close to 1.000 hours of flight testing with its four flying A380s and has received 159 firm orders from 16 customers to date, including three new customers in 2005. (Emphasis added.)

51.    The positive announcements about the A380 were reiterated a few days later on March 10, 2006, in a press release titled "Airbus A380 reaches milestone of 1000 flight hours." Defendants assured that "upon completion of the certification process, the world's largest commercial airliner [the A380] is *scheduled to be delivered to the first operator Singapore Airlines in late 2006. The A380 is already a proven success story*, with 159 orders from 16 customers." (Emphasis added.)

52.    On March 21, 2006, based on information from defendants, Morgan Stanley issued a positive rating for EADS securities. Specifically, the report noted that "[w]e have

conviction management will meet or exceed its targets. . . . We increase our 2006 - 10 EPS forecast from 5% to 10%, which lifts our PT to Euro 40." With respect to the A380, the Morgan Stanley report also noted that "[w]e expect A380 and A400M profits to prolong Airbus' EBITDA growth through 2010, two years after the expected peak in deliveries."

53.    On March 27, 2006, based on information from defendants, Merrill Lynch also issued a positive rating for EADS securities. The report raised EADS to "neutral" from "sell," explaining that "Airbus will probably beat plane-delivery goals, helping EADS exceed its earnings forecasts for this year." With respect to the A380, Merrill Lynch noted that it "will overtake Boeing Co.'s 420-seat 747 as the world's biggest airliner when the first plane is delivered to Singapore Airlines Ltd. at the end of this year."

54.    On May 16, 2006, defendants issued a press release (filed with the SEC on June 1, 2006) titled "First quarter results confirm solid growth prospects." With respect to the A380, the press release stated that:

> The *A380 certification is on track* as the programme reached two major test milestones early May. Airbus successfully completed the first extensive ground cabin tests in a fully equipped A380 and accomplished 10,000 flight cycles in the fatigue tests. Already in the first quarter 2006, the certification authorities approved the crucial A380 evacuation trial and validated the maximum seating capacity of 853 passengers. *The first delivery is scheduled for the end of 2006*, and the plan for the next year's delivery ramp up is undergoing a review to reflect workload and possible implications from the subsequent phases of the certification process.

(Emphasis added). The press release also announced that "[f]ree cash flow before customer financing is expected to remain robust in 2006, despite the build up of inventories related to the delivery ramp-up, particularly for the A380."

55.    On June 2, 2006, EADS also filed its 2005 annual report with the SEC, which stated that:

2005 was a significant year from an industrial and programme point of view with the 'reveal' of the A380, and the first flight on the 27th April 2005. At year-end 2005, Airbus has received a total of 159 firm orders for the A380 from leading world airlines. . . . When deciding to launch the programme, Management set itself a 20% ore-tax internal rate of return on target, together with a project break-even point of approximately 250 aircraft. It is satisfied that the terms and conditions presently agreed with its customers corroborate the business case.

56.     Defendants also explained that the "paramount strategic goal" was to "deliver first-rate economic returns in a sustainable manner by continuing to develop a superior family of products and commanding half of the world commercial aircraft market over the long-term. . . . This entails a major effort to deliver the first A380s to customers before the end of 2006."

### The Truth Begins to Emerge But Defendants Continue the Fraud

57.     On June 13, 2006, following the market closings, defendants released a "revised Airbus A380 delivery schedule," stating:

Following a detailed review of the A380 production and delivery programme, Airbus revised the A380 delivery schedule for the period 2006 - 2009. According to this plan, one aircraft is to be delivered in 2006. In 2007, A380 deliveries will likely be limited to nine. Compared to the initial delivery target there will be shortfalls of five to nine aircraft deliveries in 2008 and of around five aircraft in 2009.

58.     The press release also quoted EADS's co-CEOs Tom Enders and Noël Forgeard as stating: "*We have a serious issue with the industrial ramp-up of the A380.* We expect Airbus management to fully deliver according to the revised schedule and, if possible, even to improve. We will strongly support the recovery actions. In addition we will look for sources of compensation across the Group." (Emphasis added.)

59.     In another press release published that day, defendants stated that "the new delays" are "mainly traceable to bottlenecks formed in the definition, manufacturing and installation of electrical systems and resulting harnesses."

60.    With respect to EADS's financials, defendants stated that the delivery delays would have the following impact:

> From 2007 to 2010, EADS anticipates annual shortfalls of EBIT contribution from the A380 programme of about €500 million relative to the original baseline plan. . . . EADS expects free cash flow shortfalls, relative to the original baseline plan, of less than €300 million in 2006, increasing to more than €1 billion in 2008, and decreasing sharply thereafter.

61.    As a result, on June 14, 2006, EADS's stock dropped 26% to 18.73 Euros per share.

62.    Several days later, on June 16, 2006, the AMF announced that it was investigating possible insider trading by certain individuals, as well as defendants Lagardère and Daimler. According to press releases dated June 19 and June 27, 2006, defendants confirmed that "the [AMF] investigation related to the development of the market in EADS shares and to timing of certain communications to the stock market."

63.    Following these announcements, EADS management was vastly restructured, with many top executives resigning.  On July 2, 2006, Gustav Humbert, President and CEO of Airbus resigned from his position, as well as his position on the EADS Executive Committee, explaining: "***The recently announced delay of the A380 production and delivery programme has been a major disappointment for our customers, our shareholders and our employees***.  As President and CEO of Airbus, I must take responsibility for this setback and feel the right course of action is to offer my resignation to our shareholders." (Emphasis added.) On the same day, Noël Forgeard resigned as CEO of EADS, as well as a member of the EADS Board and Chairman of the Airbus Shareholder Committee.

64.    On July 2, 2006, the Company also announced that the Board appointed Louis Gallois to replace Forgeard and join Tom Enders as co-CEO.  The following day, defendants announced that: "[d]ue to the management difficulties of recent weeks and the A380 crisis

17

EADS's reputation is at stake. We'll have to regain the trust of our customers, investors and - not least - our employees in the management, the strategy and the products of EADS." They also noted that they "believe in the great potential of the company.... The most recent market successes, particularly the important win of the LUH program in the U.S. this weekend, serve as a reminder of what an EADS going fully global can accomplish."

65.    On July 27, 2006, defendants issued a press release (filed with the SEC on August 3, 2006) titled "EADS delivers solid-half year performance in growing markets." The press release stated that "the revised A380 delivery schedule announced on June 13 resulted from manufacturing issues such as the definition, manufacturing and installation of electrical systems and harnesses."

66.    On September 21, 2006, defendants announced that there could be further delays in the A380 program, noting that although the "Company's assessment is still under way, continuing industrialization challenges with the wiring of production aircraft have been identified and are being tackled. Consequently, from what it known today, there will be further delays. The current status is that we have not finalized the schedule of deliveries nor the financial impact of any delays."

67.    Defendants issued a press release on October 3, 2006 formally announcing a third delay in the delivery of the A380, stating that only one A380 would be delivered in 2007, as opposed to the nine previously promised by defendants. While previous delays were attributed to "wiring problems," the October 3 release stated that:

> In June, the amount of work to be done to finalise the installation of the electrical harnesses into the forward and rear section of the fuselage had been underestimated. Beyond the complexity of the cable installation, the root cause of the problem is the fact that the 3D Digital Mock up, which facilitates the design of the electrical harnesses installation, was implemented late and that the people working on it were in their learning curve.

68.    The October 3 press release also explained that "the revised A380 delivery schedule results in cumulative EBIT shortfalls of €4.8 billion compared to the margin contribution of its original baseline plan for the years 2006 to 2010 (at $1.30 per €1.00)." In the following days, the Company announced the resignation of Christian Streiff as Airbus CEO and member of the EADS Executive Committee, to be replaced by Louis Gallois, who had been appointed as co-CEO of EADS in July 2006. On October 31, the Company announced the appointments of new Airbus executives to "increase transparency."

69.    The statements set forth above were materially false and misleading when made as the statements misrepresented and/or omitted adverse facts that then existed, and disclosure of which was necessary to make the statements not false and/or misleading. The true facts that were known to each of the defendants -- which they failed to disclose -- were that : (1) Airbus was plagued with serious production problems and development costs that would delay the roll-out of the A380 plane; (2) the negative impacts the A380 delays would have on the Company's financial condition; (3) EADS's internal revenue forecasts and projections were much lower than market expectations; (4) defendants were engaging in rampant insider trading based on their knowledge of the problems surrounding the A380; (5) the Company lacked adequate internal and financial controls and procedures, which allowed defendants to trade EADS shares while in possession of material non-public information; and (6) the Company's financial statements were materially false and misleading.

70.    As a result of defendants' false statements, EADS securities traded at artificially inflated prices during the Class Period, causing millions of dollars of damages to the Class when the truth was revealed and the artificial inflation was released from EADS's stock price.

The Truth Continues to Emerge

71.    On March 11, 2008, the full truth concerning defendants' fraudulent scheme (including its impact on EADS's financial results) was revealed when defendants issued a press release titled "EADS 2007 Results: strong business performance while facing significant challenges" announcing its 2007 financial results.  EADS reported a loss of €446 million, or $696 million for 2007-- weighed down by widening losses at Airbus.  The March 11, 2008 press release stated, in pertinent part:

> 2007 was a tough year with many high profile challenges to be overcome. The whole of EADS has shown strength and dedication in tackling these challenges and while there is still a lot of work to be done in order to regain the full trust of our investors and customers we have made a lot of progress.
>
>                    *          *          *
>
> *Revenues* stood at €39.1 billion (FY 2006: €39.4 billion), supported by higher commercial aircraft deliveries at Airbus (453 units versus 434 compared to the previous year), as well as increased volumes at Eurocopter and EADS Astrium. Despite an unfavorable US Dollar impact and a decrease in A400M revenue recognition Group revenues remained roughly stable in comparison with the previous year.
>
> **EADS recorded a *Net Loss* of €446 million (Net Income FY 2006: € 99 million), or a loss per share of € 0.56 (earnings per share FY 2006: € 0.12)**

72.    The Company's disclosure that it had suffered a net loss of €446 million for the year 2007 shocked the market, causing the price of EADS's shares to decrease significantly, closing at $16.10 on March 11, 2008 on heavy trading volume of 12,346,600 - - a 54% decline from the Class Period high of $35.13 on March 24, 2006.

73.    As confirmed in recent news articles, EADS's huge loss for 2007 is attributed to Airbus's production delays with the roll-out of the A380.  In fact, a March 11, 2008 news article stated:

> European plane maker Airbus made an operating loss of more than a billion dollars last year…, forcing parent company EADS into the red.

\*      \*      \*

Airbus, struggling with cost overruns on its A380 superjumbo project .... made an operating loss of 881 million euros (1.4 billion dollars), worse than the loss of 572 million euros in 2006.

74.    According to an April 1, 2008 news article, the AMF is pressing charges of insider trading against defendants because of undisclosed delays and cost overruns concerning the A380.  The article states that the French financial market regulator is investigating whether 17 current and former executives of EADS (including defendants Crosby and Leahy), and EADS's main corporate shareholders (defendants Lagardère and Daimler), sold shares based on inside information that the A380 was having production problems.  Another April 1, 2008 news article notes that the AMF and French judicial authorities have been investigating share sales going back to May 2005, before the Company announced that production difficulties would delay the roll-out of the A380.

75.    An April 9, 2008 New York Times article confirms that defendants were aware, as far back as June 2005, that profits were likely to decline, largely as a result of development costs and production problems at Airbus -- and that there was the likelihood of significant delays to the A380.  The article further states that EADS's two largest corporate shareholders, defendants Lagardère and Daimler, sold 7.5% stakes in April 2006, when they had access to this internal information.

76.    According to the April 9, 2008 New York Times article, senior EADS and Airbus managers (i.e., defendants) were aware "at the latest" by March 1, 2006, that "for the second consecutive year and for identical reasons," deliveries of crucial components of the A380 to the final assembly line had been disrupted.

## NO SAFE HARBOR

77.    The safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false or misleading statements pleaded in this Complaint because none of the statements pleaded herein are "forward-looking statements" nor were they identified as "forward-looking statements" when made.    Nor did meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in any purportedly forward looking statements.    In the alternative, to the extent that the statutory safe harbor does apply to any statements pleaded herein that are deemed to be forward looking, defendants are liable for those false forward-looking statements because at the time each of those statements were made the speaker actually knew those forward-looking statements were false and/or the statements were authorized and/or approved by an executive office or the company of its co-controlling shareholders who actually knew that the statements were false when made.

## DEFENDANTS' SCIENTER

78.    As alleged herein, defendants acted with scienter in that defendants knew or recklessly disregarded that the public documents and statements issued or disseminated by them or in the name of the Company were materially false and misleading and/or omitted to state material facts necessary to make their statements not misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

79.    Defendants had the motive and opportunity to perpetrate the fraudulent scheme and course of business described herein.

80.     As set forth in detail throughout the Complaint, defendants, by virtue of their receipts of information reflecting the true facts regarding the Company, their control over and/or receipts of EADS's allegedly materially misleading misstatements and/or their associations with the Company that made them privy to confidential proprietary information concerning the Company, were active and culpable participants in the fraudulent scheme alleged herein.

81.     Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public.  The ongoing fraudulent scheme described in the Complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the individual defendants.

82.     During the Class Period, and with the Company's securities trading at artificially inflated prices, defendants sold 122,580,000 shares of EADS stock for gross profit of €3,988.9 million.  This trading by the defendants is evidenced by the following chart:

| Defendant | Shares sold | Profit |
|---|---|---|
| John Leahy | 260,000 | €3.1 m |
| Ralph D. Crosby, Jr. | 100,000 | €1.4 m |
| Lagardère | 61,110,000 | €1,992.2 m |
| Daimler | 61,110,000 | €1,992.2 m |
| **Total:** | **122,580,000** | **€3,988.9 m** |

## CLASS ACTION ALLEGATIONS

83.     Plaintiff brings this action as a Class Action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure consisting of all purchasers of publicly traded securities of EADS between May 9, 2005 and March 11, 2008 (the *Class*).  Excluded from the Class are

defendants, directors and officers of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

84.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to plaintiff at the present time and can only be ascertained through appropriate discovery from books and records maintained by the Company and/or its agent(s), plaintiff believes that there are, at a minimum, hundreds of thousands of members of the Class located who traded during the Class Period.

85.     Plaintiff will fairly and adequately represent and protect the interests of the members of the Class and has retained competent counsel experienced in class actions and securities litigation and intends to prosecute this action vigorously. Plaintiff is a member of the Class and does not have interests antagonistic to, or in conflict with, the other members of the Class.

86.     Plaintiff's claims are typical of the claims of the members of the Class, as plaintiff and all other members of the Class each sustained damages arising out of the defendants' same wrongful course of conduct in violation of federal laws as complained therein.

87.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     Whether the federal securities laws were violated by defendants' acts and omissions as alleged herein;

(b)     Whether defendants issued false and misleading financial statements concerning EADS during the class period;

(c)     Whether defendants participated in and pursued the common course of conduct and fraudulent scheme complained of herein;

(d)     Whether defendants had the ability to control the Company's public statements;

(e)     Whether the documents, reports, filings, releases and statements disseminated to the investing public, including investors in EADS securities, during the Class Period omitted and/or misrepresented material facts about EADS;

(f)     Whether defendants acted knowingly or recklessly in issuing false and misleading financial statements and/or in omitting to state and/or misrepresenting material facts;

(g)     Whether the market prices of the Company's securities during the Class Period were artificially inflated due to the non-disclosures and/or misrepresentations complained of herein; and

(h)     Whether plaintiff and the other members of the Class have sustained damages and, if so, the appropriate measure of these damages.

88.     Plaintiff's claims are typical of those of the Class.  Prosecution of individual actions would create a risk of inconsistent adjudications.  Plaintiff will adequately protect the interests of the Class.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

89.     Plaintiff will rely upon the presumption of reliance established by the fraud-on-the market doctrine in that, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    the omissions and misrepresentations were material;

(c)    the Company's stock and ADRs traded in efficient markets;

(d)    the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock and ADRs; and

(e)    Plaintiff and other members of the Class purchased EADS securities between the time defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

90.    At all relevant times, the market for EADS securities was efficient for the following reasons, among others:

(a)    As a regulated issuer, EADS filed periodic public reports; and

(b)    EADS regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

91.    As a result of the foregoing, the market for EADS's publicly traded securities promptly digested current information regarding EADS from all publicly available sources and reflected such information in EADS's stock price.  Under these circumstances, all purchasers of EADS's publicly traded securities during the Class Period suffered similar injury through their purchase of EADS's publicly traded securities at artificially inflated prices as evidenced by, among other things, stock price decline when the artificial inflation was released from EADS stock, and a presumption of reliance applies.

## LOSS CAUSATION

92.     Defendants' false and misleading statements had the intended effect and causes, or were a substantial contributing cause of EADS's stock trading at artificially inflated levels throughout the Class Period.

93.     During the Class Period, as detailed herein, defendants made false and misleading statements that artificially inflated the prices of EADS's securities and operated as a fraud or deceit on the Class.  Later, when defendants' prior misrepresentations and fraudulent conduct began to reach the market, the price of EADS's securities fell as the prior artificial inflation came out of the stock prices over time. As a result of their purchases of EADS securities during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

94.     The timing and magnitude of EADS's stock price decline negates any inference that the loss suffered by the Class was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to the defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by plaintiff and the Class was a direct and proximate result of defendants' scheme and misrepresentations and omissions that artificially inflated EADS's stock price, and the subsequent significant decline in the value of EADS's stock when the truth concerning defendants' prior misrepresentations and fraudulent conduct entered the market place.

## COUNT I

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder

95.     Plaintiff repeats and reiterates each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

96.     This count is asserted against all defendants and is based upon section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and rule 10b-5 promulgated thereunder.

97.     During the Class Period, defendants directly engaged and carried out a common plan, scheme, and unlawful course of conduct pursuant to which it knowingly or recklessly engaged in acts, transactions, practices, and other courses of business which operated as a fraud and deceit upon plaintiff and the other members of the Class, and made various deceptive and untrue statements of material facts and omitted to state material facts in order to make the statements made, in light of the circumstances under which they were made, not misleading to plaintiff, in light of the circumstances under which they were made, not misleading to plaintiff and the other members of the lass. The purpose and effect of said scheme, plan, and unlawful course of conduct was, among other things, intended to induce throughout the Class Period, the plaintiff and other members of the Class to purchase EADS securities during the Class Period at artificially inflated prices.

98.     During the Class Period, defendants, pursuant to said scheme, plan, and unlawful course of conduct, knowingly and/or recklessly issued, caused to be issued, participated in the issuance of, the preparation and issuance of deceptive and materially false and misleading statements to the investing public as particularized above.

99.     As a result of the defendants' dissemination of and/or failure to correct the false and misleading statements set forth above, the market prices of the Company's securities were artificially inflated during the Class Period.  Unaware of the false and misleading nature of the

statements described above and the deceptive and manipulative devices and contrivances employed by said defendants, plaintiff and the other members of the Class suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for EADS securities. Plaintiff and the Class would not have purchased EADS securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

100.    Plaintiff and the other members of the Class have suffered substantial damages as a result of the wrongs herein alleged in an amount to be proved at trial.

101.    The undisclosed adverse information concealed by defendants during the Class Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

102.    By reason of the foregoing, defendants directly violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they:

(a)    employed devices, schemes, and artifices to defraud;

(b)    made untrue statements of material facts or omitted to state material facts in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(c)    engaged in acts, practices, and a course of business which operated as a fraud and deceit upon plaintiff and the other members of the Class in connection with their purchases of EADS securities during the Class Period, and

(d)    are liable to plaintiff and the other members of the Class for damages which they have suffered in connection with their purchases of EADS securities during the Class Period.

## COUNT II

### Violation of Section 20(a) of the Exchange Act

103.    Plaintiff repeats and reiterates each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

104.    The defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions and active participation in and/or awareness of the Company's day-to-day operations, and/or intimate knowledge of the Company's plans and implementation thereof, including but not limited to their representation on the Board of Directors or through the co-CEOS and co-Chairmen, as well as the controlling interest, each had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected including the content and dissemination of the various statements that plaintiff contends are false and misleading.  Each defendant was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

105.    In particular, the defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or

influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

106.    By virtue of their positions as controlling persons, the defendants, are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of the wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

WHEREFORE, plaintiff, on her own behalf and on behalf of the Class, pray for judgment as follows:

(A)    Declaring this action to be proper class action and certifying plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure;

(B)    Awarding monetary compensatory damages in favor of plaintiff and the other members of the Class against all of the defendants jointly and severally for the damages sustained as a result of the wrongdoings of the defendants, together with interest thereon;

(C)    Awarding plaintiff the fees and expenses incurred in this action, including reasonable allowance of fees for plaintiff's attorneys, and experts;

(D)    Granting extraordinary equitable and/or injunctive relief as permitted by law, equity and federal and state statutory provisions sued on hereunder, including attaching, impounding, imposing a constructive trust upon or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that Plaintiff has an effective remedy; and

(E)    Awarding monetary damages against all of the defendants, jointly and severally, in favor of the Plaintiff and the other members of the Class for all losses and damages

suffered as a result of the wrongdoings alleged herein, including punitive damages where appropriate, together with interest thereon;

(F)    Granting plaintiff such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED: June 12, 2008

Respectfully Submitted

DREIER LLP
Daniel B. Scotti (DS-4129)
Brian C. Kerr (BK-6079)
499 Park Avenue
New York, New York 10022
212.328.6100

*Attorneys for Plaintiff*

## CERTIFICATION OF PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

I, Danielle Bobin, hereby declare under penalty of perjury that:

1. I have reviewed the draft complaint against Lagardère SA, Daimler AG, Ralph D. Crosby, Jr., and John Leahy, entitled *Bobin v. Lagardère SA, et. al.*, and have authorized the filing of the complaint on my behalf by Dreier LLP.

2. I did not purchase the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in this action.

3. I am willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. My transactions during the Class Period (May 9, 2005 to March 11, 2008) are as set forth below:

| Purchases Date of Purchases | Number of Shares Purchased | Price per Share |
|---|---|---|
| January 9, 2006 | 70 | Euros 31.50 |
| January 24, 2006 | 60 | Euros 30.72 |
| | | |
| | | |

5. During the three-year period preceding the date of my signing this certification, I have not sought to serve, nor have I served, as a representative party on behalf of a class in a private action under the federal securities laws.

6. I will not accept any payment for serving as a representative party on behalf of the class beyond my pro rata share of any recovery, except such reasonable cost and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court. I understand that this is not a claim form, and that my ability to share in any recovery as a member of the class is unaffected by my decision to serve as a representative party.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 12th day of June, 2008.


DANIELLE BOBIN